UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT L. GOULDING, | 4:14-CV-04151-KES |
| Plaintiff, | |
| vs. | |
| DENNIS KAEMINGK, SECRETARY OF CORRECTIONS AT SD DEPARTMENT OF CORRECTIONS, INDIVIDUAL AND OFFICIAL CAPACITY; DARIN YOUNG, WARDEN AT SDSP, INDIVIDUAL AND OFFICIAL CAPACITY; HOPE JOHNSON, LANA JACKSON, UNIT COORDINATOR AT SDSP, INDIVIDUAL AND OFFICIAL CAPACITY; AND JENNIFER DREISKE, DEPUTY WARDEN AT SDSP, INDIVIDUAL AND OFFICIAL CAPACITY; | REPORT AND RECOMMENDATION |
| Defendants. | |

**INTRODUCTION**

This matter is before the court on the *pro se* second amended complaint

of Robert L. Goulding, a prisoner at the South Dakota State Penitentiary

(SDSP).[1]  See Docket No. 45.  As explained in more detail below, the court

construes Mr. Goulding's complaint to allege both a claim under the Religious

Land Use and Institutionalized Persons Act (RLUIPA, 42 U.S.C. §§ 2000bb,

---

[1] Mr. Goulding was at the SDSP when this lawsuit began.  See Docket No. 1.
Prior to February 17, 2016, he was transferred to the Mike Durfee State Prison
(MDSP).  See Docket No. 48.  He was then transferred back to the SDSP prior
to April 1, 2016.  See Docket No. 52.  Although Mr. Goulding expressed his
hope that his return to SDSP was temporary, he has not notified the court that
he has been moved from SDSP back to the MDSP.  The court assumes he
continues to reside at the SDSP as of this writing.

2000cc), and a claim under 42 U.S.C. § 1983 and the First Amendment.  See Docket No. 45, pp. 1 and 4.  On March 17, 2016, defendants filed a joint motion for summary judgment.  See Docket No. 49.  Mr. Goulding's only response to the motion was to file a Directory of Sabbath-Observing Groups on April 1, 2016.  See Docket No. 53.  The following is this court's recommended disposition of defendants' motion.

## UNDISPUTED MATERIAL FACTS

The following is a recitation of defendants' statement of undisputed facts filed in support of their motion pursuant to this court's local rules.  See DSD LR 56.1.  Mr. Goulding has not responded in opposition to this statement nor has he set forth any statement of facts of his own as to which he contends a material dispute exists.  Accordingly, the defendants' statement of material facts is deemed admitted.  See DSD LR 56.1D.

**A.   Parties and Claims**

1.   Plaintiff, Robert Goulding, is an inmate currently housed at the [SDSP],[2] serving a life sentence without parole. Doc. 48; Linneweber Affidavit ¶ 4; Exhibit 7; Wagner Affidavit ¶ 2.

2.   Plaintiff initiated the present lawsuit on or about October 2, 2014. In a Civil Rights Complaint filed on that date, Plaintiff alleges/complains that "my request to hold a (my own) Saturday (Sabbath) service was denied." According to Plaintiff, he was "injured by my inability to worship my God in what I [Plaintiff] believe to be the manner (i.e. - on Saturday) biblically directed by Him and by my

---

[2] Defendants' statement of facts indicates Mr. Goulding is now residing at the MDSP.  That is incorrect.  See Footnote 1, supra.

inability, thusly, to have Holy Communion." Doc. 1, p. 4.  [See also Docket No. 45, at p. 4—Mr. Goulding has not changed this recitation in his second amended complaint.] This Court was therefore asked to "impel the SDSP to allocate chapel space and guard oversight for an inmate led Saturday (Sabbath) church service" and for a bible study.  Doc. 1, p. 7; Docket No. 45 at p. 7.

3.     Subsequent thereto, Plaintiff filed, on December 23, 2014, a Motion to Amend his Complaint indicating that he had been "unable to locate Hope Johnson" and therefore "wished to remove her as a Defendant." Doc. 19. According to Plaintiff, "both Hope Johnson (as Cultural Activities Coordinator) and Jennifer Wagner (as Associate Warden) were signators to my original request for a Sabbath (Saturday) service that was denied." Plaintiff, therefore, stated that "I wish to drop Hope Johnson from the lawsuit and add Jennifer Wagner as a Defendant." Doc. 19.

4.     The Court, in its Report and Recommendation dated June 25, 2015, ordered that Plaintiff's Motion to Amend should be granted. Plaintiff, therefore, was directed therein to "file an Amended Complaint within 21 days of the date of this opinion." Doc. 28, p. 21.

5.     On July 17, 2015, Plaintiff filed his "First Amended Complaint" wherein he again alleged that Defendants violated his "First Amendment Free Exercise of religion" when they denied his request to "hold a (my own) Saturday (Sabbath) worship service." Doc. 30, p. 4.

6.     Plaintiff, in a Second Motion to Amend dated September 1, 2015, indicated that, "in addition to observing the Sabbath (Saturday) with a worship service, I would ask to observe the Passover Feast with a Seder meal." Doc. 39. In

addition thereto, Plaintiff stated that "I would ask for a weekly instruction time to hold a discipleship class."

7.    The Court granted Plaintiff's Motion to Amend his Complaint in a text Order dated October 14, 2015. Doc. 42.

8.    Subsequent thereto, on or about February 18, 2016, Plaintiff was transferred to the MDSP in Springfield, South Dakota. Doc. 48.

9.    Defendant Dennis Kaemingk, as indicated in Plaintiff's Amended Complaint, serves as the Secretary of the South Dakota Department of Corrections (SDDOC). Doc. 30, p. 2. Plaintiff maintains that Secretary Kaemingk was "responsible for his underling's denial of my request to hold a Sabbath service."

10.    Defendant Darin Young is, as indicated by Plaintiff in his Amended Complaint, the Warden of the SDSP in Sioux Falls, South Dakota. Doc. 30, p. 2. Plaintiff alleges that Warden Young is also "responsible for his underling's denial of my request to hold a Sabbath service."

11.    Defendant Jennifer Wagner, as indicated in Plaintiff's Amended Complaint, is a Deputy Warden at the SDSP in Sioux Falls, South Dakota. Doc. 30, p. 2. It is alleged that "she is responsible for denying my request to hold a Sabbath service."

12.    Defendant Lana Jackson is a Unit Coordinator at the SDSP in Sioux Falls, South Dakota. Doc. 30, p. 2. According to Plaintiff, "she improperly receipted my appeal of the denial of my Sabbath service."

13.    As found, however, by the Court, in its Report and Recommendation dated June 25, 2015, "That prison grievance processes were not properly followed or were inadequate is not enough to be actionable under § 1983." Doc. 28, p. 14.

According to the Court, "Though Mr. Goulding perceives the Defendants' responses to his prison grievances as 'pro forma' and intended to cause the appeal to fail, these perceived shortcomings do not 'rise to a protected liberty interest requiring the protections envisioned by the [Constitution].'" Doc. 28, p. 15.

14.    The Court, therefore, in its Report and Recommendation, recommended "granting Defendants' motion as to Mr. Goulding's fairly, clearly articulated claim that Defendants mishandled his administrative appeal or did not consider the merits of that appeal correctly." Doc. 28, p. 16.

15.    The Court, in an Order dated July 22, 2015, adopted the aforesaid Report and Recommendation and granted Defendants' Motion to Dismiss Plaintiff's claim that they had handled his administrative appeal incorrectly. Doc. 32. As such, Defendant Jackson is not a proper Defendant herein.

16.    In its Report and Recommendation, the Court also recommended that Defendants' Motion to Dismiss the damages claims against them in their official capacities should be granted. Doc. 28, p. 21. As found by the Court, "It is clear that Mr. Goulding may not receive damages from any Defendant sued in his or her official capacity." Doc. 28, p. 19.

17.    That recommendation was also later adopted by the Court in its Order dated July 22, 2015. Doc. 32. Plaintiff's request for monetary damages against Defendants in their official capacities was thus dismissed.

**B.    Saturday (Sabbath) Worship Service**

18.    Plaintiff, while incarcerated at the SDSP in Sioux Falls, South Dakota, submitted a "Project Application" on December 31, 2013, wherein he requested authorization to "provide an inmate led non-denominational Christian Sabbath

service for the worship and praise of God and to bring our prayers and petitions to Him in a communal setting." Exhibit 1; Wagner Affidavit ¶ 3.

19.     In said Project Application, Plaintiff maintained that "this service will benefit all Christians who wish to keep the Sabbath holy by praising and worshiping God together on that day (Saturday) each week." Exhibit 1; Wagner Affidavit ¶ 3.

20.     Plaintiff, however, failed to indicate/mention in the aforesaid Project Application whether there were any other inmates actually interested in attending his "inmate led non-denominational Christian Sabbath service." Exhibit 1; Wagner Affidavit ¶ 4.  [Here, the court notes that the exhibit submitted by Mr. Goulding at Docket No. 53 is a Directory of Sabbath-Observing Groups published by the Bible Sabbath Association.  Mr. Goulding offers this directory "to show that I am not alone in my Sabbatian beliefs but rather have many brethren—no matter what [defendant's attorney] may say."]

21.     Plaintiff also neglected, in said Project Application, to identify the number of other inmates he proposed or anticipated would be attending any such worship service. Exhibit 1; Wagner Affidavit ¶ 4. In regards thereto, Plaintiff maintained in his Project Application that "there is no 'required' number." Exhibit 1; Wagner Affidavit ¶ 5.

22.     According to Plaintiff, he was "In any case, not anticipating more than the phone room can accommodate, at least to start with." Exhibit 1; Wagner Affidavit ¶ 5.

23.     There was nothing, however, in the documentation/information submitted by Plaintiff to support his pure speculation regarding the number of

other inmates interested in attending any such service. Exhibit 1; Wagner Affidavit ¶ 6. Plaintiff, to Defendants' knowledge, was the only inmate at the SDSP requesting an "inmate led non-denominational Christian Sabbath service." Wagner Affidavit ¶ 6.

24.     At the time of Plaintiff's Project Application, there were already at least two (2) other Saturday worship services offered to inmates at the SDSP. Wagner Affidavit ¶ 7. Those services included a Catholic Mass and a Baptist prayer service. Exhibit 2; Wagner Affidavit ¶ 7.

25.     In addition to the above services offered on Saturday, arrangements had also been made whereby officials at the SDSP allowed Orthodox Jewish inmates to gather on Saturday evenings for worship services. Wagner Affidavit ¶ 7.

26.     There was no indication whatsoever by Plaintiff, in his Project Application, that the Saturday (Sabbath) worship services already in place at the SDSP were not adequate to meet his religious needs. Wagner Affidavit ¶ 8. In that regard, Plaintiff failed to make any showing to prison officials that the beliefs/views professed by other inmates during said worship services were significantly different from his own or otherwise fundamentally incompatible with his beliefs as a self-professed Sabbatarian. Wagner Affidavit ¶ 8.

27.     Plaintiff also neglected to provide officials at the SDSP with any information or documentation which would have even remotely suggested that the outside religious volunteers supervising/leading the other Saturday worship services held or professed religious beliefs significantly different from his own. Wagner Affidavit ¶ 9.

7

28.     There was thus not even the slightest showing by Plaintiff that attending any one of the other worship services already held at the SDSP on Saturdays would significantly impair or hamper his ability to adhere to or practice his Sabbatarian faith. Wagner Affidavit ¶ 9.

29.     Similar Saturday (Sabbath) worship services are also available at the MDSP. In addition to the "Catholic Mass" held on Saturdays, a number of Havdalah (Jewish religious ceremony) services are also offered on Saturday evenings to "mark the symbolic end of the Shabbat [Sabbath]." Linneweber Affidavit ¶ 6.

30.     Once again, however, Plaintiff has not made any showing that attending any of the above Saturday worship services at the MDSP would significantly hamper or impair his ability to freely exercise his religion. Linneweber Affidavit ¶¶ 7-8.

31.     There has been no indication whatsoever by Plaintiff to suggest that his religious beliefs as a "Saturday Sabbath keeper" significantly differ from those of the other "Christian" groups already gathering on Saturdays for worship services at the MDSP. Linneweber Affidavit ¶¶ 7-9.

32.     A review of the Informal Resolution Request submitted by Plaintiff, on January 21, 2014, following the denial of his aforementioned Project Application, reveals that Plaintiff simply indicated therein that "I believe this to be a religious liberties issue." Exhibit 4; Wagner Affidavit ¶ 10.

33.     There was no mention whatsoever, in the aforesaid Informal Resolution Request, to the other Saturday worship services already available at the SDSP. Exhibit 4; Wagner Affidavit ¶ 10. At no point therein did Plaintiff

8

suggest/indicate that those other services extolled/espoused religious views significantly incompatible with his own. Exhibit 4; Wagner Affidavit ¶ 10.

34.     Based on the information/documentation provided by Plaintiff, there was simply no reason for officials at the SDSP to believe that his religious beliefs required him to worship separately from the other groups/religious sects already gathering on Saturdays for Christian worship services. Wagner Affidavit ¶ 11.

35.     Plaintiff was therefore advised, in an Informal Resolution Response dated January 22, 2014, that "You did not provide documentation to support your Project Application in question." Exhibit 5; Wagner Affidavit ¶ 12.

36.     Subsequent thereto, on or about January 30, 2014, Plaintiff submitted a Request for Administrative Remedy wherein he merely indicated that he had "been a Sabbatarian (Saturday Sabbath keeper) for about 40 years." Exhibit 6; Wagner Affidavit ¶ 13. According to Plaintiff, he had been "a dedicated Sabbath keeper."

37.     Plaintiff, in his Request for Administrative Remedy, further indicated that he was a "member of the Bible Sabbath Association which is dedicated to promote the Seventh Day Sabbath." Exhibit 6; Wagner Affidavit ¶ 13.

38.     Once again, however, Plaintiff failed to mention anything therein which would have even remotely suggested to officials at the SDSP that attending one of the other Saturday worship services already available would have been incompatible with his beliefs as a "Saturday Sabbath keeper." Wagner Affidavit ¶ 14.

39.     There is nothing in the information/documentation supplied by Plaintiff to indicate that he belonged or was a member of the particular sect of

Sabbatarians known as "Sacred Name Sabbatarian" who believe that the term "God," used by other Christian sects, is offensive/blasphemous. Wagner Affidavit ¶ 15. Plaintiff used that term repeatedly in his Project Application. Exhibit 1; Wagner Affidavit ¶ 15. Thus, to Defendant Wagner's personal knowledge, there was nothing to suggest or indicate that Plaintiff's religious beliefs were significantly different from those professed by the other inmates already gathering at the SDSP on Saturdays for worship services. Officials at the SDSP were therefore not aware of anything which would require Plaintiff to worship separately from those inmates. Wagner Affidavit ¶ 17.

40.    In that regard, a review of his institutional file reveals that, for purposes of his religious affiliation, Plaintiff listed or identified himself only as "Christian." Wagner Affidavit ¶ 16; Linneweber Affidavit ¶ 9.

41.    A review of the record herein further reflects that this Court, in response to Plaintiff's conclusory assertions/allegations that it would be "absurd to equate his religious beliefs with those of Catholics or Baptists," found that Plaintiff "does not state what his beliefs are and how they may differ from other already available religious services at the prison." Doc. 28, p. 14.

42.    Since that time, Plaintiff has been allowed to amend his Complaint on at least two separate occasions. Docs. 30, 45. At no time, however, did Plaintiff undertake in said amended pleadings to "state what his beliefs are and how they may differ from other already available religious services at the prison." Docs. 30, 45.

10

43.   Defendants, therefore, had no way of knowing, based on the information available, that the denial of Plaintiff's Project Application to "hold a (my own) Saturday (Sabbath) worship service" would result in a violation of his rights to freely exerciser his religion. Wagner Affidavit ¶ 17.

44. In denying Plaintiff's Project Application to hold "a (my own) Saturday (Sabbath) worship service," Defendant Wagner also relied, in part, on established policy in place at the SDSP. Pursuant thereto, inmate-led worship services, for security purposes, are not, as a general rule, allowed at either the SDSP or MDSP. Wagner Affidavit ¶ 18; Linneweber Affidavit ¶ 11; Dooley Affidavit ¶ 6.

45.   Said policy, in the opinion of prison officials, is necessary in order to preserve security within the institution. Wagner Affidavit ¶ 19; Linneweber Affidavit ¶ 11; Dooley Affidavit ¶ 6. Unsupervised group worship services, in the opinion of officials, pose the danger of becoming a forum for dissention and unrest among inmates. Wagner Affidavit ¶ 19; Linneweber Affidavit ¶¶ 11-12; Dooley Affidavit ¶ 6.

46.   Allowing inmates, as a general rule, to conduct their own religious/worship services without the supervision of an outside volunteer could also potentially result in the development of a leadership hierarchy among inmates. Wagner Affidavit ¶ 20; Linneweber Affidavit ¶ 12; Dooley Affidavit ¶ 7.

47.   The establishment of such a hierarchy within the prison could likely lead to certain inmates developing/holding leadership roles that would not only be contrary to the authority of prison officials but could also promote/foster the formation of conspiracies within the institution. Wagner Affidavit ¶ 20; Linneweber Affidavit ¶ 12; Dooley Affidavit ¶ 7.

48.     In light of these security concerns, the policy in place at both the SDSP and MDSP requires that, as a general rule, outside volunteers rather than inmates lead/supervise worship services. Wagner Affidavit ¶ 21; Linneweber Affidavit ¶ 13; Dooley Affidavit ¶ 8.

49.     At the present time, there are in excess of 60 religious volunteers available to lead/supervise worship services among inmates. Wagner Affidavit ¶ 21; Linneweber Affidavit ¶ 13; Dooley Affidavit ¶ 8.

50.     Despite the number of religious volunteers available, there are nonetheless limited instances where a volunteer is simply not available, on a regular basis, to lead/supervise certain religious sects within the institution. Wagner Affidavit ¶ 22; Linneweber Affidavit ¶ 14; Dooley Affidavit ¶ 9.

51. There are thus limited exceptions to the general rule that inmate led worship services are not allowed at either the SDSP or MDSP. Wagner Affidavit ¶ 22; Linneweber Affidavit ¶ 14; Dooley Affidavit ¶ 9.

52.     In order, however, for limited exception to apply, it must be shown/established that the particular religious sect does not have access to a local outside volunteer to lead/conduct the worship services on a regular basis. Wagner Affidavit ¶ 23; Linneweber Affidavit ¶ 15.

53.     Due to the lack of regular access to an outside religious volunteer, there are presently six (6) religious groups/sects within the SDSP that are allowed to meet without supervision by such a volunteer. Those groups/sects include Buddhists, Jews, Muslims, Asatrus, Wiccans and Native Americans. Wagner Affidavit ¶ 23.

12

54.     Similar exceptions are also allowed at the MDSP for inmate-led worship services. In addition to the aforementioned groups, Jehovah's Witnesses and Mormons are also permitted to meet without a religious volunteer to conduct such services. Linneweber Affidavit ¶ 15.

55.     Although both groups/sects do otherwise have access to a religious volunteer to assist them in certain matters, those volunteers are unable to travel to the MDSP on a regular basis. Linneweber Affidavit ¶ 15.

56.     Although the aforesaid groups/sects are allowed to meet without a religious volunteer present to lead the worship services, institutional security demands/requires that a correctional officer be present to properly supervise the inmates. Wagner Affidavit ¶ 24; Linneweber Affidavit ¶ 16; Dooley Affidavit ¶ 10.

57.     Limited resources do not allow prison officials to provide/assign correctional officers to supervise each and every group/sect that request to gather for worship services. Wagner Affidavit ¶ 24; Linneweber Affidavit ¶ 16; Dooley Affidavit ¶ 10.

58.     Said limitation is due to the demands placed on prison officials in attempting to administer to the religious needs of hundreds/thousands of inmates who represent widely diverging faith/views. Wagner Affidavit ¶ 25; Linneweber Affidavit ¶ 17; Dooley Affidavit ¶ 11.

59.     Prison officials, due to the limited resources available, simply cannot, as a practical matter, cater to the desires of every religious sect within the institution regardless of the number of inmates who profess to be a member thereof. Wagner Affidavit ¶ 25; Linneweber Affidavit ¶ 17; Dooley Affidavit ¶ 11.

60.     Such a requirement would impose unjustified burdens on prison officials and jeopardize the effective management of the institution. The cost associated with requiring officials to make accommodations to cater to each and every religious gathering/sect within the institution, regardless of size, would have an obvious impact on the already limited resources available to those officials. Wagner Affidavit ¶ 26; Linneweber Affidavit ¶ 18; Dooley Affidavit ¶ 12.

61.     That is particularly true in the instant case since Plaintiff failed to submit any information/documentation whatsoever to Defendants which would have suggested that an outside volunteer was not otherwise available to lead/conduct his proposed "non-denominational Christian Sabbath service." Wagner Affidavit ¶ 27; Linneweber Affidavit ¶ 19.

62.     Absent any showing by Plaintiff that he did not have access to a local outside volunteer, there was no reason for Defendants to depart from the general rule that inmate led worship services are not allowed within the institution. Wagner Affidavit ¶ 28; Linneweber Affidavit ¶ 20.

63.     As already indicated elsewhere herein, volunteers were already supervising/conducting a number of other worship services offered to inmates on Saturdays. Wagner Affidavit ¶ 27; Linneweber Affidavit ¶ 19.

64.     A review of Plaintiff's institutional file also reveals that, since his transfer to the MDSP, Plaintiff has not submitted any Project Application requesting authorization to "hold a (my own) Saturday (Sabbath) service" while at said institution. Linneweber Affidavit ¶ 4.

14

65.     The record further reflects that officials at the MDSP have not, in the past, received any request from other inmates in regards to an "inmate led non-denominational Christian Sabbath service." Linneweber Affidavit ¶ 5.

66.     Based on the lack of any such request, there does not appear to be any interest in or demand for such a worship service at the MDSP. Linneweber Affidavit ¶¶ 5-6.

67.     Moreover, the record reflects that Plaintiff has also never, either at the SDSP or MDSP, submitted a Project Application in connection with a "weekly instruction time to hold a discipleship class." Wagner Affidavit ¶ 29; Linneweber Affidavit ¶ 21.

68.     Plaintiff's failure to submit any such Project Application is understandable given the fact there are already a number of bible studies being held at both the SDSP and MDSP. Exhibits 2-3; Wagner Affidavit ¶ 29; Linneweber Affidavit ¶ 21.

69.     There has been no showing whatsoever by Plaintiff that attending any one of the several bible studies already being offered at the SDSP/MDSP would have been incompatible with and thereby hampered his religious beliefs. Wagner Affidavit ¶ 30; Linneweber Affidavit ¶ 22.

70.     Once again, there is nothing in the record to even remotely suggest that, given the number of other bible studies already available, Plaintiff needed "group study time" separate from the other groups/sects. Wagner Affidavit ¶ 30; Linneweber Affidavit ¶ 22.

71.     The same is also true with regards to Plaintiff's request to "observe the Passover Feast with a Seder meal." A review of Plaintiff's institutional file

15

reveals that no project application has ever been submitted by Plaintiff in connection with a "Seder meal." Wagner Affidavit ¶ 31; Linneweber Affidavit ¶ 23.

## DISCUSSION

### A.      Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions

16

of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Fed. Practice & Procedure, § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

Though *pro se* litigants like Mr. Goulding are entitled to a liberal construction of their pleadings, FED. R. CIV. P. 56 remains equally applicable to them.  Quam v. Minnehaha Co. Jail, 821 F.2d 522, 522 (8th Cir. 1987).  The district court is not required to "plumb the record in order to find a genuine issue of material fact." Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th

17

Cir. 1996).  Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed *pro se* in vindicating their constitutional rights, and [the Eight Circuit does] not approve summary dismissal of such *pro se* claims without regard for these special problems." Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980).  "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985).

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue in favor of the movant only if there is no genuine dispute as to any material fact *and* the movant is entitled to judgment as a matter of law. Therefore, even where a summary judgment motion is unopposed, the court must still determine if summary judgment is appropriate.  See Canada v. Union Elec. Co., 135 F.3d 1211, 1213 (8th Cir. 1997) (failure by nonmoving party to respond to summary judgment motion is not dispositive of the motion); United States v. One Parcel of Real Property, 27 F.3d 327, 329 n.1 (8th Cir. 1994) (same); FED. R. CIV. P. 56, Advisory Committee Notes to 2010 amendment, subdivision (e) (stating "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion.").

**B.    Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Goulding must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected

18

federal right.' " <u>Zutz v. Nelson</u>, 601 F.3d 842, 848 (8th Cir. 2010) (quoting
<u>Schmidt v. City of Bella Villa</u>, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from
having to defend themselves in a civil suit if the conduct of the officials "does
not violate clearly established statutory or constitutional rights." <u>Harlow v.
Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from
suit, not just a defense to liability at trial.  <u>Mitchell v. Forsyth</u>, 472 U.S. 511,
526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the
importance of resolving immunity questions at the earliest possible stage in
litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 536 (1991).

To determine whether an official may partake of qualified immunity, two
factors must be determined:  (1) whether the facts that plaintiff has shown
make out a violation of a constitutional right and (2) whether that
constitutional right was "clearly established" at the time of the official's acts.
<u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If the court finds that one of the two
elements is not met, the court need not decide the other element, and the court
may address the elements in any order it wishes "in light of the circumstances
of the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).
Defendants are entitled to qualified immunity if the answer to either of the
<u>Saucier</u> prongs is "no."

"Qualified immunity gives government officials breathing room to make
reasonable but mistaken judgments," and "protects 'all but the plainly
incompetent or those who knowingly violate the law.' " <u>Stanton v. Sims</u>, 571

19

U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 131
S. Ct. 2074, 2085 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986))).
" 'We do not require a case directly on point' before concluding that the law is
clearly established, 'but existing precedent must have placed the statutory or
constitutional question beyond debate.' " <u>Stanton</u>, 134 S. Ct. at 5.  " 'Officials
are not liable for bad guesses in gray areas; they are liable for transgressing
bright lines.' " <u>Ambrose v. Young</u>, 474 F.3d 1070, 1077 (8th Cir. 2007)
(quoting <u>Hunter</u>, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the
[qualified] immunity defense, the district court should resolve that threshold
question before permitting discovery." <u>Crawford-El v. Britton</u>, 523 U.S. 574,
598 (1998) (citing <u>Harlow</u>, 457 U.S. at 818).  Only if the plaintiff's claims
survive a dispositive motion on the issue of qualified immunity will the plaintiff
"be entitled to some discovery." <u>Id.</u>  Even then, the Court has pointed out that
FED. R. CIV. P. 26 "vests the trial judge with broad discretion to tailor discovery
narrowly and to dictate the sequence of discovery." <u>Id.</u>  Such discretion
includes the ability to establish limits on the number of depositions and
interrogatories, to limit the length of depositions, to limit the number of
requests to admit, to bar discovery on certain subjects, and to limit the time,
place, and manner of discovery as well as its timing and sequence.  <u>Id.</u>

## C.   **Mr. Goulding's First Amendment Claim**

The First Amendment to the United States Constitution states in relevant
part, "Congress shall make no law respecting an establishment of religion, or

20

prohibiting the free exercise thereof . . ."  U.S. CONST. amend. I.  Prisoners do

not forfeit all their constitutional rights because they have been convicted of a

crime and incarcerated.  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  Inmates

clearly retain their First Amendment rights, including the right to the free

exercise of religion.  Cruz v. Beto, 405 U.S. 319, 322 (1972).  However,

limitations may be placed on the exercise of prisoners' constitutional rights in

light of the needs of the penal system to deter crime, rehabilitate prisoners, and

maintain institutional security.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348

(1987)[3]; Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 982 (8th Cir.

2004).  Constitutional claims that would receive strict scrutiny in any other

setting are evaluated under a lesser standard of scrutiny in a prison setting.

Turner v. Safley, 482 U.S. 78, 81 (1987).  A prison regulation may restrict a

prisoner's constitutional rights if it is "reasonably related to legitimate

penological interests."  Turner, 482 U.S. at 89.

---

[3] The holding in O'Lone was legislatively superseded by Congress when it
passed the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C.
§ 2000bb.  The Supreme Court later held RFRA to be unconstitutional as
applied to states.  City of Boerne v. Flores, 521 U.S. 507 (1997).  Congress
responded to City of Boerne by enacting the Religious Land Use and
Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, the
constitutionality of which has been upheld.  RFRA and RLUIPA establish a
more difficult standard for defendants to meet if the plaintiff can show that
defendants substantially burdened a plaintiff's exercise of religion—these
statutes require defendants to show that the substantial burden furthers a
compelling governmental interest and that it does so with the least restrictive
means.  42 U.S.C. §§ 2000bb, 2000cc.  Mr. Goulding's First Amendment claim
is evaluated under the reasonableness standard enunciated in Turner and
O'Lone, which remain good law as to the First Amendment.  Mr. Goulding's
RLUIPA claim is discussed in a subsequent portion of this opinion.

The threshold question for any prisoner First Amendment free-exercise claim is whether prison officials have substantially burdened the plaintiff's sincerely held religious beliefs.  Gladson v. Iowa Dept. of Corrections, 551 F.3d 825, 833 (8th Cir. 2009).

> [T]o demonstrate a substantial burden on the exercise of religion, a government policy or action " 'must significantly inhibit or constrain [religious] conduct or [religious] expression . . .; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.' "

Van Wyhe v. Reisch, 581 F.3d 639, 656 (8th Cir. 2009)(quoting Patel v. United States Bureau of Prisons, 515 F.3d 807, 813 & n.7 (8th Cir. 2008) (quoting Murphy, 372 F.3d at 988)).  Further,

> [w]here the state conditions receipt of an important benefit upon conduct prescribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.  When the significance of a religious belief is not an issue, the same definition of substantial burden applies under the Free Exercise Clause and RLUIPA.

Gladson, 551 F.3d at 832 (citations omitted, punctuation altered).

Once the plaintiff makes the threshold showing of a substantial burden, the court applies the Turner analysis to determine whether the regulation is reasonably related to a legitimate penological interest: (1) is there a valid, rational connection between the regulation and the governmental interest justifying it; (2) is there an alternative means available to the inmate to exercise the right; (3) would the accommodation have a significant ripple effect on the

guards, other inmates, and prison resources; and (4) is there an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests.  <u>Turner</u>, 482 U.S. at 90-91.

There are two components to Mr. Goulding's First Amendment free exercise claim.  First, he seeks to have a religious service and bible study on Saturday.  Second, he seeks to have the service be inmate-led, although he is willing to allow the service to be supervised by a prison guard.

The threshold question is whether prison officials have substantially burdened Mr. Goulding's sincerely held religious beliefs.  <u>Gladson</u>, 551 F.3d at 833.  "[T]o demonstrate a substantial burden on the exercise of religion, a government policy or action ' " 'must significantly inhibit or constrain [religious] conduct or [religious] expression . . .; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." ' " <u>Van Wyhe</u>, 581 F.3d at 656 (quoting <u>Patel</u>, 515 F.3d at 813 & n.7 (quoting <u>Murphy</u>, 372 F.3d at 988)).

Here is the entirety of Mr. Goulding's statement in his complaint about what his religious beliefs are:

> My request to hold an ongoing Sabbath (Saturday) church service was denied—with no reason given.
>
> I have been injured by my inability to worship my God in what I believe to be the manner (i.e.—on Saturday) Biblically directed by Him and by my inability, thusly, to have Holy Communion.

<u>See</u> Docket No. 45 at p. 4.  Because Mr. Goulding makes reference to the Bible as the basis of his belief, the court infers that his beliefs fall into the rather

large category of Judeo-Christian beliefs.  But other than that generalization, the court can divine nothing more about Mr. Goulding's beliefs from his second amended complaint.

Though not obligated to do so, the court has scoured the record looking for a more detailed articulation of Mr. Goulding's beliefs.  In his project application to the prison authorities, Mr. Goulding explained that, if he were allowed to hold a Saturday Sabbath worship service "this service will benefit all Christians who wish to keep the Sabbath holy by praising and worshiping God together on that day (Saturday) each week."  See Docket No. 50-1.  In the application, Mr. Goulding explains he would request to purchase bread and grape juice for fellowship/communion.  Id.  From this description, the court infers Mr. Goulding's beliefs can be categorized generally as Christian.  Indeed, upon Mr. Goulding's introduction to the South Dakota penitentiary system he identified himself as a Christian.  See Docket No. 50-10 at p. 6, ¶ 16.

Mr. Goulding exhausted his prison administrative remedies.  But the court finds among those administrative documents no further explanation of Mr. Goulding's religious beliefs.  See Docket No. 50-4, 50-6.

Previously, defendants filed a Rule 12(b)(6) motion to dismiss Mr. Goulding's complaint for failure to state a claim.[4]  See Docket No. 17.  The court has reread Mr. Goulding's response in opposition to that motion to try to glean the nature of Mr. Goulding's religious beliefs.  See Docket No. 27.

---

[4] Defendants' motion was denied.  See Docket Nos. 28 & 32.

In his response to the Rule 12(b)(6) motion to dismiss, Mr. Goulding stated he believes the 4th Commandment requires him to keep Saturday holy as the Sabbath.  Id. at p. 2.  Mr. Goulding called defendants' assertion that he could attend other Saturday religious services "absurd," but did not explain *why* it was absurd.  Id. at p. 3.  He chided defendants for equating Catholicism with Protestantism, saying the Protestant Reformation happened for a reason. Id.  He also stated "[t]here are no services here that meet my needs to Honor the Sabbath by keeping it Holy.  Coincidence of time is in no way congruence of purpose."  Id. at p. 4.  However, Mr. Goulding never explained what his religious beliefs are—other than that he believes Saturday is the Sabbath—or why a Protestant or Catholic religious service held on a Saturday was inadequate to meet his religious beliefs.

Significantly, in ruling on defendants' motion to dismiss, this court alerted Mr. Goulding that simply dismissing defendants' suggestions as "absurd" was not sufficient to show a substantial burden.  See Docket No. 28 at p. 14.  Despite this advance warning from the court, Mr. Goulding has still not supplied the court with any additional detail in response to defendants' summary judgment motion.

Not only is the record before this court bare of any real indication of Mr. Goulding's religious beliefs, but defendants have asserted Mr. Goulding never explained those beliefs to them as well.  See Docket No. 50-9 at pp. 3-4; Docket No. 50-10 at p. 3.  Because they have no idea how Mr. Goulding's beliefs differ from existing religious worship services, defendants do not have

25

any reason to believe Mr. Goulding's beliefs are incompatible with the beliefs espoused in existing services.  Docket No. 50-9 at p. 4; Docket No. 50-10 at p. 3-5.

Currently, the following religious services are held on Saturdays at the prison:

> Commands of Christ Bible Study
> Catholic Mass
> Native American Church
> Jehovah's Witness Bible Study
> Spanish Bible Study
> Jewish Havdalah
> Messianic Havdalah
> Kabbalah Havdalah

See Docket No. 50-3.  Saturday religious services are offered for Catholic, Baptist and Jewish denominations.  See Docket No. 50-10 at p.3, ¶ 7.

What are the requirements for honoring the Sabbath?  Mr. Goulding offered no explanation to this court.  In his project application, he cited Exodus 20:8 11; Deuteronomy 5:12-15; Isaiah 56; and Jeremiah 17:19-27 without explaining their significance to prison officials.  The court's own research reveals each of these scriptures instructs that one should refrain from work on the Sabbath.  This is a personal obligation which Mr. Goulding is free to implement—so long as it is not inconsistent with the prison's need for rules, order, and authority.  Refraining from work does not require Mr. Goulding to attend a worship service that instructs him to do so.  He may simply refrain from work.

The Bible also states that the Sabbath is "a day of sacred assembly."  See Leviticus 23:3.  Mr. Goulding may honor this requirement by attending one of

the group worship services already offered at the prison.  Mr. Goulding has not explained how or why attending one of the existing worship services substantially burdens his belief that Saturday should be honored as the Sabbath.  The court, on its own, cannot find any such showing in the record.

In <u>Love v. Reed</u>, 216 F.3d 682, 685-86 (8th Cir. 2000), a prisoner brought suit alleging his First Amendment rights had been violated by defendants because he believed he needed to honor the Sabbath from sundown on Saturday until sundown on Sunday.  He believed he should not leave his cell or do any work on the Sabbath.  <u>Id.</u> at 686.  This belief extended to the belief that he was not permitted to eat food prepared by others on the Sabbath, or to have food workers serve him through their work on the Sabbath.  <u>Id.</u>  As an accommodation, he requested the prison provide him with bread and a jar of peanut butter for him to store in his cell and eat during the Sabbath.  <u>Id.</u> The district court ruled in the prisoner's favor, holding that to the extent the prisoner had sufficient funds to purchase food from the commissary, he must do so and use commissary food for his in-cell Sabbath meals.  <u>Id.</u> at 689. However, on those occasions the prisoner had insufficient funds to purchase commissary food, the prison authorities were required to provide bread and peanut butter.  <u>Id.</u>  The Eighth Circuit affirmed the district court's ruling.  <u>Id.</u> at 691.  The prisoner in <u>Love</u> set forth his religious beliefs in some detail and explained in some detail how defendants' refusal to accommodate his religious dietary needs substantially burdened his beliefs.  <u>Id.</u> at 686-90.

In <u>Gillard v. Kuykendall</u>, 295 Fed. Appx. 102, 104 (8th Cir. 2008) (unpub'd.), a prisoner, Gillard, believed the Sabbath ran from 6 p.m. on Friday until 6 p.m. on Saturday.  On Sabbath, Gillard asserted he was required to engage in complete rest; that the only work he was allowed to do was make his bed; that he could work only if necessary to feed his family, to keep his job, or if he had no choice in his schedule.  <u>Id.</u>  These details were supported by Gillard's affidavit and his pastor's affidavit.  <u>Id.</u>  Gillard brought suit over the prison's requirement that he sweep and mop his cell floor and empty the trash on Saturday mornings.  <u>Id.</u>  The court held he had demonstrated a sincerely held religious belief that was being substantially burdened by the prison's rule. <u>Id.</u> at 104-06.

The <u>Love</u> and <u>Gillard</u> decisions are distinguishable from Mr. Goulding's case.  In each of their cases, Love and Gillard demonstrated in some detail before the district court, by affidavit and sworn testimony, what their sincere religious beliefs were and how those beliefs were being substantially burdened by defendants' practices.  Here, other than saying he believes Saturday is the Sabbath, Mr. Goulding has not made any showing of his religious beliefs and how those beliefs are being substantially burdened by defendants' practices. Even the information about not working on Sabbath and attending group worship services on Sabbath are details the court is guessing about—they were not details Mr. Goulding provided.

In <u>Wier v. Nix</u>, 114 F.3d 817, 820 (8th Cir. 1997), the court held the prisoner's religious beliefs were not substantially burdened.  The prisoner was

28

a fundamentalist Protestant whose beliefs coincided in large part with the prison chaplain's fundamentalist Christian beliefs. <u>Id.</u> The prisoner, however, believed in "separatism," which required him to separate himself from religious leaders whose teachings offend fundamentalist precepts. <u>Id.</u> at 819. The prison chaplain did not share this belief in separatism. <u>Id.</u> at 820. The court held that the First Amendment did not require that a prisoner be provided with a religious leader whose beliefs were identical to his own. <u>Id.</u> Rather, the First Amendment is initially implicated only when "a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own." <u>Id.</u> Here, the court concluded the prisoner had failed to show a substantial burden on his religious beliefs just because the prison chaplain did not share his belief in separatism. <u>Id.</u>

In <u>Patel</u>, a Muslim sued the prison alleging a violation of the First Amendment because the prison refused to provide *halal* food. <u>Patel</u>, 515 F.3d at 813-15. The court held Patel failed to show his practice of his Islamic faith was substantially burdened because he had several other options to obey the dietary restrictions imposed by his religion, including eating a vegetarian diet, eating a kosher diet, and purchasing food on occasion from the commissary. <u>Id.</u>

Here, there are group worship services available on Saturdays from Christian faiths that believe in a Sabbath (Catholicism and some sects of Baptists), albeit perhaps on a day different than Mr. Goulding believes it occurs. This is not unlike <u>Weir</u> where the prisoner had access to a worship

29

service that was congruent with his beliefs in all but a few aspects.  Weir, 114 F.3d at 820.  Especially where observing the Sabbath is such an individual matter of conscience, Mr. Goulding does not show how attending another Christian service on Saturday from a denomination that also observes the Sabbath is a substantial burden.  It is Mr. Goulding's burden to show that denying him his own group worship service "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of [his] religious beliefs" or that defendants "meaningfully curtail [his] ability to express adherence to his . . . faith" or that defendants have denied him "reasonable opportunities to engage in those activities that are fundamental to [his] religion."  Patel, 515 F.3d at 813.

Mr. Goulding's sole response to defendants' motion for summary judgment was the filing of a directory of groups which observe the Sabbath.  See Docket No. 53.  This directory does not advance Mr. Goulding's cause.  The directory, by showing the sheer number of groups that observe the Sabbath, would tend to support, by inference, that Mr. Goulding's belief in the Saturday Sabbath is sincerely held.  But neither the court nor defendants challenge that assertion.  The court assumes that Mr. Goulding's belief is sincerely held.  It is the substantial burdening of that belief on which any proof is lacking.

The court concludes that Mr. Goulding has failed to make the threshold showing that his sincerely held religious belief is substantially burdened by his having to attend a Catholic, Jehovah's Witness, Baptist or Jewish religious ceremony on a Saturday.  Because he never explains what his religious beliefs

*are* and how they are substantially burdened by attending currently-available Saturday worship services, the court cannot conclude that Mr. Goulding's religious beliefs are being substantially burdened.  The court never reaches the Turner analysis because of Mr. Goulding's failure to establish the threshold substantial burden.

The court notes, too, that—lacking any indication of a showing of a substantial burden in the record—defendants would also be entitled to qualified immunity on Mr. Goulding's First Amendment damages claim (individual capacity claims) because there is no showing that they were " 'plainly incompetent or . . . knowingly violate[d] the law.' "  Stanton, 571 U.S. ___, 134 S. Ct. at 5 (quoting al-Kidd, 563 U.S. at ___, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. at 341)).  The court recommends granting defendants' motion for summary judgment on Mr. Goulding's First Amendment claim.

**D.   Mr. Goulding's RLUIPA Claim**

The Religious Land Use and Institutionalized Persons Act (RLUIPA) provides that "no government shall impose a substantial burden on the religious exercise of a person residing in or confined in an institution . . ." 42 U.S.C. § 2000cc-1.  "When the significance of a religious belief is not at issue, the same definition of substantial burden applies under the Free Exercise Clause  . . . and RLUIPA."  Gladson, 551 F.3d at 832 (citations omitted).  "[T]o demonstrate a substantial burden on the exercise of religion, a government policy or action must significantly inhibit or constrain religious

conduct or religious expression, must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in activities that are fundamental to a person's religion." Van Wyhe, 581 F.3d at 656; Patel, 515 F.3d at 813.[5] Further,

> "[w]here the state conditions receipt of an important benefit upon conduct prescribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial. When the significance of a religious belief is not an issue, the same definition of substantial burden applies under the Free Exercise Clause and RLUIPA.

Gladson, 551 F.3d at 832 (citations omitted, punctuation altered).

RLUIPA does not permit suit against state officials in their individual capacities because the Spending Clause authority by which RLUIPA was enacted does not support an action against an official in his or her individual capacity. Van Wyhe, 581 F.3d at 655, n.6.[6] See also, Jihad v. Fabian, 2011 WL 1641885 at *8 (D. Minn. Feb. 17, 2011) (RLUIPA does not permit claims against prison officials in their individual capacities because individual prison personnel do not themselves receive federal funding). Further, because the state did not waive its immunity from suit for monetary damages by accepting federal funds on the conditions set forth in the institutionalized persons section

---

[5] Both Van Wyhe and Patel noted that RLUIPA, unlike the Free Exercise Clause, does not require a religious belief to be a "central tenet" or "fundamental" in order to be protected. Van Wyhe, 581 F.3d at 656; Patel, 515 F.3d at 814, n.7.

[6] This was not an issue in the Van Wyhe appeal.

of RLUIPA, official capacity claims under RLUIPA are limited to injunctive relief. Sossamon v. Texas, 563 U.S. 277, 293 (2011); Van Wyhe, 581 F.3d at 655.

It is not entirely clear that Mr. Goulding is asserting a RLUIPA claim.  His statement of his claim at page 4 of his second amended complaint only mentions the First Amendment; it does not mention RLUIPA.  See Docket No. 45 at p. 4.  Mr. Goulding's second amended complaint contains only one claim. Id. at pp. 4-6.  However, on the first page of the form complaint the prisoner is asked to indicate the basis for this court's jurisdiction.  Id. at p. 1.  There are three boxes available to be checked:  a box for § 1983, a box for Bivens,[7] and a box for "other."  Id.  Mr. Goulding checked the box for "other" and then wrote in "42 U.S.C. § 21(c) § 2000 RLUIPA."  In the spirit of liberally construing his complaint, the court assumes Mr. Goulding is asserting a claim under RLUIPA.

Because it is Mr. Goulding's burden also under RLUIPA to show that his religious beliefs are substantially burdened by defendants' practices, his RLUIPA claim fails for the same reason his First Amendment claim failed—he never explains how his belief in a Saturday Sabbath is being substantially burdened by defendants' practices.  For this reason, the court also recommends summary judgment be granted to defendants on Mr. Goulding's RLUIPA claim.  In addition, the court would also note that any claim for damages asserted against defendants under RLUIPA would independently be

---

[7] Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971). Mr. Goulding incorrectly invoked Bivens as the basis for his suit in his initial complaint filed herein.  See Docket No. 1 at p.1.  This court explained to Mr. Goulding what a Bivens action was and why Mr. Goulding's case could not be a Bivens action.  Docket No. 28 at pp. 6-7.

subject to dismissal.  Sossamon, 563 U.S. at 293; Jihad, 2011 WL 1641885 at *8; Van Wyhe, 581 F.3d at 655, n.6.

## CONCLUSION

This court respectfully recommends that defendants' motion for summary judgment [Docket No. 49] be granted and that judgment in favor of defendants be entered on each of Mr. Goulding's claims.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED September 23, 2016.

BY THE COURT:

_____

VERONICA L. DUFFY
United States Magistrate Judge